UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

| | |
|---|---|
| CHARLES EDWARD O'NEIL, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | CASE NO. 5:07-00358 |
| ) | |
| UNITED STATES OF ) | |
| AMERICA, *et al.* ) | |
| ) | |
| **Defendants.** ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending are Plaintiff's Application to Proceed Without Prepayment of Fees (Document No. 1.) and Motion for Temporary Restraining Order and Preliminary Injunction (Document No. 8.). Having examined Plaintiff's Complaint, the undersigned has concluded that Plaintiff fails to state a claim for which relief can be granted in this matter and therefore respectfully recommends that Plaintiff's Application to Proceed Without Prepayment of Fees (Document No. 1.) and Motion for Temporary Restraining Order and Preliminary Injunction (Document No. 8.) be denied and this matter be dismissed.

**FACTUAL BACKGROUND**

On June 4, 2007, Plaintiff, an inmate at Federal Correction Institution, Beckley [hereinafter FCI Beckley], West Virginia, initiated this action against the United States, the former Warden of FCI Beckley, medical officials at FCI Beckley, and private medical providers pursuant to the Federal Tort Claims Act, 28 §§ 1346(b) and 2671, et seq., and for alleged violations of Plaintiff's constitutional rights pursuant to Bivens v. Six Unknown Federal Agents of Federal Bureau of

Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 24 L.Ed.2d 619(1971)(Document No.1).[1]  Plaintiff names the following individuals as Defendants: (1) Marty Anderson, former Warden of FCI Beckley; (2) David Ellis, Contract Psychiatrist, FCI Beckley; (3) Dominick McLain, D.O., Clinical Director, FCI Beckley; (4) Robin Franco, MRT, FCI Beckley; (5) Kenneth Kaiser, Physician Assistant, FCI Beckley; (6) Robin Lipps; (7) Scotty Rose, Clinical Director, FCI Beckley; (8) Sherry Taylor, Physician Assistant, FCI Beckley; (9) K. Rose; (10) Kevin Thompson; (11) Richard Russell, AWCO, FCI Beckley; (12) Sue Engels; (13) James Blankenship, former Nurse Practictioner, FCI Beckley; (14) N. Rehberg, D.O., Staff Physician, FCI Beckley; (15) Kate McDaniel; (16) Jerri Kirkland, Registered Nurse and Health Services Administrator, FCI Beckley; (17) Syed Rasheed, M.D., and (18) Mallard Medical Services, Inc. Essentially, Plaintiff alleges that Defendants violated his rights under the Fifth and Eighth Amendments of the United States Constitution by failing to provide him with adequate medical care for his chronic hyperthyroidism and Graves' disease, causing him pain and suffering. (Document No. 4-2, p. 24.) Plaintiff seeks an injunctive order directing Defendants "to arrange without delay for Plaintiff to be examined by a qualified endocrinologist and a cardiologist specialist every 90 or 180 days." (Id., p. 35.) Furthermore, Plaintiff seeks Sixty Million Dollars in monetary damages for physical and emotional injury resulting from the Defendants' failure to provide adequate medical care. (Id., p. 36.)

By Standing Order entered on August 1, 2006, this matter was referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Document No. 13.) Pursuant to 28 U.S.C. § 1915A, the Court is required to screen each case in which a prisoner seeks redress

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally.  *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

2

from a governmental entity or officer or employee of a governmental entity. On screening, the Court must recommend dismissal of the case if the complaint is frivolous, malicious or fails to state a claim upon which relief can be granted. A "frivolous" complaint is one which is based upon an indisputably meritless legal theory. <u>Denton v. Hernandez</u>, 504 U.S. 25, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992). A "frivolous" claim lacks "an arguable basis either in law or in fact." <u>Neitzke v. Williams</u>, 490 U.S. 319, 325, 109 S.Ct. 1827, 1831 - 32, 104 L.Ed.2d 338 (1989). A claim lacks an arguable basis in law when it is "based on an indisputably meritless legal theory." <u>Id.</u>, 490 U.S. at 327, 109 S.Ct. at . A claim lacks an arguable basis in fact when it describes "fantastic or delusional scenarios." <u>Id.</u>, 490 U.S. at 327 - 328, 109 S.Ct. at 1833. A complaint therefore fails to state a claim upon which relief can be granted factually when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him or her to relief. With these standards in mind, the Court will assess Plaintiff's allegations in view of applicable law.

## ANALYSIS

### I. **Plaintiff's FTCA Claim.**

Plaintiff asserts a negligence claim under the Federal Tort Claims Act against the Defendants in their individual capacities, as well as the United States Government. Such claims are appropriately raised against the United States under the Federal Tort Claims Act [FTCA], 28 U.S.C. §§ 2671-2680. An inmate "can sue under the FTCA to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." <u>United States v. Muniz</u>, 374 U.S. 150 (1963). The FTCA provides at § 2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like

circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

The FTCA, however, does not create a new cause of action. Medina v. United States, 259 F.3d 220, 223 (4th Cir. 2001). The statute merely "permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." Id.

In the present case, Plaintiff alleges that Defendants' negligent acts occurred in the State of West Virginia. Accordingly, West Virginia state law applies. Under West Virginia law, a plaintiff must satisfy certain prerequisites prior to filing suit against a health care provider. Specifically, a plaintiff must serve each defendant health care provider with a notice of claim with an attached screening certificate of merit executed under oath by a health care provider qualified as an expert under the West Virginia Rules of Evidence at least thirty (30) days prior to filing suit. W. Va. Code § 55-7B-6.[2] Compliance with West Virginia Code § 55-7B-6 is mandatory prior to filing suit in

---

[2] West Virginia Code § 55-7B-6 provides the following in pertinent part:

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying the provisions of this section.

(b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding.

4

federal court. Stanley v. United States, 321 F.Supp.2d 805, 806-07 (N.D.W.Va. 2004); also see Starns v. United States, 923 F.2d 34 (4th Cir. 1991)(holding that Virginia's medical malpractice liability cap applies to claims brought against the United States under the FTCA). Based on the forgoing, the undersigned finds that there is nothing in Plaintiff's Complaint or exhibits indicating that Plaintiff has complied with the requirements of West Virginia Code § 55-7B-6. Therefore, Plaintiff's Federal Tort Claims Act claims must be dismissed.

**II. Plaintiff's Bivens Claim.**

The allegations stated in Plaintiff's Complaint of violations of his constitutional rights are cognizable under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). A Bivens action is a judicially created damages remedy which is designed to vindicate violations of constitutional rights by federal actors. See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. at 395-97, 91 S.Ct. at 2004-05; See also Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)(extending Bivens to Eighth Amendment claims); Davis v. Passman, 442 U.S. 228, 239 n. 18, 99 S.Ct. 2264, 2274 n. 18, 60 L.Ed.2d 846 (1979)(extending Bivens to allow citizen's recovery of damages resulting from a federal agent's violation of the Due Process Clause of the Fifth Amendment.) A Bivens action is the federal counterpart of an action under 42 U.S.C. § 1983. An action for money damages may be brought against federal agents acting under the color of their authority for injuries caused by their unconstitutional conduct. Proof of causation between the official's conduct and the alleged injury is necessary for there to be liability. A plaintiff asserting a claim under Bivens must show the

---

Nothing in this subsection may be construed to limit the application of Rule 15 of the Rules of Civil Procedure.

violation of a valid constitutional right by a person acting under color of federal law.[3] The United States Supreme Court has held that an inmate may name a federal officer in an individual capacity as a defendant in alleging an Eighth Amendment constitutional violation pursuant to Bivens. See Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). However, Bivens claims are not actionable against the United States, federal agencies, or public officials acting in their official capacities. See FDIC v. Meyer, 510 U.S. 471, 475, 484-86, 114 S.Ct. 996, 127 L.Ed. 2d 308 (1994); Berger v. Pierce, 933 F.2d 393, 397 (6th Cir. 1991); Reinbold v. Evers, 187 F.3d 348, 355 n. 7 (4th Cir. 1999).

### A. Eighth Amendment Claim:

The Eighth Amendment protects against the infliction of "cruel and unusual punishments." As a general matter, prohibited punishments include those which "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)(*quoting* Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)). "It not only outlaws excessive sentences but also protects inmates from inhumane treatment and

---

[3] Inmates may file claims of liability against the United States under the FTCA but may not assert claims of personal liability against prison officials for violations of their constitutional rights. *Carlson v. Green*, 446 U.S. at 21-23, 100 S.Ct. at 1472 -74. By contrast, under *Bivens* inmates may assert claims of personal liability against individual prison officials for violations of their constitutional rights but may not assert claims against the government or prison officials in their official capacities. The Supreme Court held in *Carlson*, 446 U.S. at 18 - 21, 100 S.Ct. at 1471-72, that an inmate could pursue a *Bivens* action independent of a FTCA action. The Court found that Congress did not intend to pre-empt a *Bivens* remedy when it enacted the FTCA. *Id.* The Court noted that the legislative history of the FTCA "made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Id.*, 446 U.S. at 19 - 20, 100 S.Ct. at 1471 -72. Relying upon *Carlson*, the Fourth Circuit found that the availability of relief under the FTCA does not automatically foreclose a *Bivens* action. *Dunbar Corp v. Lindsey*, 905 F.2d 754, 762 (4th Cir. 1990). The Court pointed out other distinctions between FTCA and *Bivens* actions in *Dunbar Corp.*: (1) only compensatory damages are available in FTCA actions, whereas compensatory and punitive damages are available under *Bivens* and (2) FTCA claims must be tried to the Court, whereas *Bivens* claims may be tried to a jury. *Id.*

conditions while imprisoned." Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996). Thus, under the Eighth Amendment, sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." Wolfish v. Levi, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds*, Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *See also* Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994)(Supreme Court noted that Eighth Amendment imposes certain duties upon prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"), *quoting* Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)); Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)(Court held that only those conditions depriving inmates of "the minimal civilized measure of life's necessities" are sufficiently grave to form the basis of an Eighth Amendment violation). The Eighth Amendment "does not mandate comfortable prisons." Rhodes v. Chapman, 452 U.S. at 349, 101 S.Ct. at 2400. "To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Id. at 347, 101 S.Ct. at 2399; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995), *citing* Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); Lopez v. Robinson, 914 F.2d 486, 490 (4th Cir. 1990). To establish a violation of the Eighth Amendment in the context of a challenge to conditions of confinement, an inmate must allege (1) a "sufficiently serious" deprivation under an objective standard and (2) that prison officials acted with "deliberate indifference" to the inmate's health and safety under a subjective standard. Wilson v. Seiter, 501 U.S. 294, 297-99, 111 S.Ct. 2321, 2323 - 2325, 115 L.Ed.2d 271 (1991). A sufficiently serious deprivation occurs when "a prison official's act or omission . . . result[s] in the denial of the minimal civilized measure of life's necessities.'" Id. at 298, 111 S.Ct. 2321 (*citing* Rhodes v. Chapman, 452

7

U.S. at 347, 101 S.Ct. 2392)."In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements – that 'the deprivation of [a] basic human need was objectively sufficiently serious,' and that 'subjectively the officials act[ed] with a sufficiently culpable state of mind.'" Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)(*quoting* Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993)(quotation omitted)). *See also* White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1991)("In *Strickler*, we held that a prisoner must suffer 'serious or significant physical or mental injury' in order to be 'subjected to cruel and unusual punishment within the meaning of the' Eighth Amendment.") The touchstone is the health of the inmate. Plaintiff in this case must therefore allege in the first place and eventually establish a "sufficiently serious" deprivation of medical care and resulting "serious or significant physical or mental injury" in order to maintain and prevail upon his Eighth Amendment claim.

To establish the subjective component of deliberate indifference, an inmate must allege and prove each defendant's consciousness of the risk of harm to the inmate. *See* Farmer, *supra*, 511 U.S. at 840, 114 S.Ct. at 1980. In particular, an inmate must establish that the prison official "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, *supra*, 511 U.S. at 837, 114 S.Ct. at 1979. An inmate may satisfy the subjective component of standard by showing that prison officials' delay in providing medical treatment caused unnecessary pain or the worsening of his condition. Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir. 1990)("Failure to respond to an inmate's known medical needs raises an inference that there was deliberate indifference to those needs."); Cameron v. Sarraf, 128 F.Supp.2d 906, 911 - 912 (E.D.Va. 2000)("Yet, it is equally clear that mere negligence or delay is not sufficient to establish deliberate indifference.").

8

The allegations and factual background found in Plaintiff's Complaint and medical records submitted therewith, do not present a claim of constitutional magnitude. Essentially, Plaintiff alleges that Defendants negligently delayed diagnosing and treating Plaintiff's serious medical conditions. Viewing the evidence favorably to Plaintiff, the undersigned finds that Plaintiff's medical conditions have been appropriately treated since Plaintiff's arrival at FCI Beckley.

On February 15, 2002, Plaintiff arrived at FCI Beckley. Upon Plaintiff's arrival, Defendant McLain performed a Medical Intake Screening. Plaintiff complained of chest pains, shortness of breath, fluid retention in legs, high blood pressure, swelling in the right side of neck, hyperthyroidism, Graves' disease, extruding eyes, tremors of the hands, and weight loss. Defendant McLain scheduled a follow-up appointment for the following week and prescribed Plaintiff the following medications: Furosemide and Propranolol. On February 27, 2002, Plaintiff was examined by Defendant Kaiser. Plaintiff made the same complaints as above and Defendant Kaiser ordered a C x R examination. The results of the C x R examination revealed that Plaintiff's "heart was mildly enlarged and an impression of cardiomegaly." (Document No. 4-2, pp. 12-14.)

On March 1, 2002, Defendants McLain and Rehberg examined Plaintiff. Plaintiff made similar complaints as above. Defendants McLain and Rehberg classified Plaintiff as a "chronic care patient" and placed him within "convalescent status,"which excuses an inmate from any work activities. Defendant Rehberg again examined Plaintiff on March 12, 14, and 15, 2002. Defendant Rehberg ordered an echocardiogram test, which revealed abnormalities. On March 24, 2002, Plaintiff was evaluated by Defendant Rasheed, an endocrinologist and "outside doctor." Defendant Rasheed prescribed Plaintiff medications for his Graves' disease and hyperthyroidism. (Document No. 4-2, pp. 14-15.)

9

On April 12, 2002, Plaintiff was admitted into the Appalachian Regional Healthcare Facility. Plaintiff was treated by Dr. Surayia Hasan and Dr. Syed Siddiqi. Dr. Siddiqi ordered the following examinations and tests: colonoscopy, ultrasound and MRI of the abdomen, and chest x-ray. The above tests revealed that Plaintiff suffered from "small right pleural effusion," "edema of the gallbladder wall consistent with acute cholecystitis," and "chronic active and acute areas of colitis with ulceration." (Document No. 4-4, pp. 20-22). Dr. Hasan performed a cardiolite stress test noting that the "test was very abnormal with cardiomegaly, low ejection fraction, myocardial changes suggestive of ischemia, and old infarct." (Id., p. 25) Dr. Hasan's discharge summary stated that Plaintiff would be referred to an endocrinologist at Charleston Area Medical Center to decide if radioactive iodine therapy was necessary. The discharge summary further noted that the "rest of patient management will be decided by Dr. Miller at CAMC." (Id., p. 25).

On April 19, 2002, Plaintiff was taken from Appalachian Regional Healthcare Facility to the Charleston Area Medical Center. Upon Plaintiff's arrival, Dr. Gary Roberts performed a cardiac evaluation. The echocardiogram revealed the following: "wall motion abnormalities with severely impaired LV systolic function, moderate aortic insufficiency, moderate MR, and moderately severe TR." (Document No. 4-5, p. 1.) After performing a left heart catheterization and selective coronary arteriography, Dr. Roberts diagnosed Plaintiff with primary myocardial disease.(Id., p. 2.) Plaintiff was discharged on April 25, 2002. Dr. Roberts' discharge summary indicated that Plaintiff suffered from the following conditions: Cardiomyopathy with an ejection fraction noted to be 15-20 percent by heart catheterization; Graves' disease; Thyrotoxicosis; and Inflammatory bowel disease. The following follow-up appointments were noted: Dr. Cassis on May 7, 2002; Dr. Hasan in 2-3 weeks; and Drs. Miller and Robert's office in 4-6 weeks. Additionally, Plaintiff was instructed to proceed with the radioactive iodine uptake and scan one week after discharge. (Id., p. 6.)

Plaintiff received the radioactive iodine uptake and scan treatment on June 6, 2002. On June 14, 2002, Plaintiff was evaluated by Defendant Rasheed to determine whether radioactive iodine treatments were necessary. Defendant Rasheed examined Plaintiff again on July 10, 2002 and ordered that Plaintiff be scheduled for a thyroid scan at Raleigh General Hospital.(Document No. 4-5, p. 12.) On July 11, 2002, Defendant Rehberg scheduled an appointment with Raleigh General Hospital. Plaintiff was transported to Raleigh General Hospital and the thyroid scan was conducted on August 29, 2002. The thyroid scan indicated that Plaintiff was suffering from Graves' disease. (Id.)

Defendant Rehberg completed a consultation sheet on October 17, 2002, referring Plaintiff to Defendant Rasheed for examination of Plaintiff's enlarged thyroid. (Id., p. 25.) On February 18, 2003, Defendant McLain referred Plaintiff to Defendant Rasheed concerning further treatment for thyrotoxicosis and Graves' disease. Based upon Plaintiff's complaints of chest pain, Defendant Rehberg examined Plaintiff and ordered an echocardiogram on March 10, 2003. (Document No. 4-6, pp. 4-5.) Defendant Rasheed evaluated Plaintiff on April 4, 2003, and noted thyrotoxicosis post radioactive iodine treatment. (Id., p. 6.) On May 12, 2003, Plaintiff was examined and prescribed medication by Defendant Taylor. (Id., pp. 7-9.) Plaintiff received a thyroid scan and radioactive iodine treatment on May 16, 2003. (Id., p. 10.)

From August 14, 2003 to March, 12, 2004, Plaintiff alleges that he experienced chest pains and despite numerous sick call request the Defendants failed to properly treat the problem. Defendant Mclain examined and treated Plaintiff for chest pains on March 4 and April 8, 2004. (Document No. 4-7, p. 4.) On May 24, 2004, Plaintiff was evaluated by Defendant Kaiser, who noted that Plaintiff was experiencing an occasional skip in his heart beat, but no chest pain. (Id., p. 13.) Plaintiff contends that Defendant McLain received Plaintiff's abnormal thyroid blood levels on

June 18, 2004, but refused to take Plaintiff off the medication Synthroid. On July 7, 2004, Defendant Taylor examined Plaintiff and discussed Plaintiff's treatment plan with Defendant McLain. (Document No. 4-8, p. 15.) On July 8, 2004, Defendant McLain referred Plaintiff for an echocardiogram and ordered that Plaintiff stop taking Synthroid. (Id., p. 17.)

On July 21, 2004, Defendant Kaiser examined and treated Plaintiff for chest pains. Due to Plaintiff's increased frequency of chest pains, Plaintiff was referred and admitted to Raleigh General Hospital on July 23, 2004. Dr. Hasan evaluated Plaintiff and ordered an echocardiogram. Dr. Hasan noted that patient was to be seen by Dr. Joshy Abraham for a further evaluation of cardiac function. (Document No. 4-9, pp. 8-9.) Dr. Abraham found that Plaintiff's laboratory studies were normal and his "chest x-ray shows no cardiomegaly or pulmonary vascular congestion." (Id., p. 11.) Plaintiff's echocardiogram results indicated the following: (1) LV appears mildly enlarged; (2) Mitral Valve appears normal and Aortic, tricuspid, and pulmonic valves are structurally normal; (3) Right ventricle, right atrium, and left atrium are normal in size; and (4) no intracardiac masses or thrombus. (Id., p. 13.) Dr. Hasan's discharge summary stated the following:

> The patient was initially admitted to the coronary care unit. He was monitored. At the time of admission, he was slightly bradycardic. His pulse rate started going up and today is 94. He is complaining of sweating. He is off Synthroid for the past 2 weeks. His echocardiogram shows that his ejection fraction is about 55% to 60%, which is much better than when it was down to 20% about 2 years ago when he was referred to Charleston Area Medical Center. Cardiac catheterization was normal. The patient's thyroid function indicate that he is still thyroid toxic. He has been on Synthroid until about 2 weeks ago. He should be kept off the Shynthroid for another 4 weeks and then have multiple uptakes to decide about the dosage and treatment with radioactive iodine. The patient should in the meantime be on Inderal 10 mg b.i.d. to start with and increased as necessary. He is to continue with Prinivil 10 mg daily, Tylenol p.r.n., and his condition at the time of discharge is table. He can gradually increase his activities.

(Id., p. 15.).

On September 27, 2004, Defendant Taylor saw Plaintiff concerning his complaints of chest pains. Defendant Taylor ordered an echocardiogram. On October 1, 2004, Defendant McLain informed Plaintiff that his thyroid was overactive and his heart was not pumping the right amount of blood and oxygen to his body. Plaintiff was prescribed Furosemide 20 mg and referred to an endocrinologist. On November 2 and 3, 2004, Plaintiff was taken to Raleigh General Hospital to receive radioactive uptake tests. (Document No. 4-2, pp. 4-7.)

On December 10, 2004, Plaintiff was admitted to Raleigh General Hospital because of an infection. Plaintiff complained of "hurting all over his body, stomach, head, eyes, neck and throat." (Id., p. 10.) Plaintiff was released from Raleigh General Hospital on December 19, 2004. On December 28, 2004, Defendant Rasheed evaluated Plaintiff and set his radioactive iodine treatment. Plaintiff received the radioactive iodine treatment on February 11, 2005. (Id., pp. 10-12.)

On February 17, 2005, Plaintiff requested a sick call appointment because of chest pains and needing refills on medications. Defendant Rose examined Plaintiff and provided medication refills on February 22, 2005. On February 24, 2005, Plaintiff again requested a sick call appointment because of chest pains. Defendant Rose examined Plaintiff and conducted an echocardiogram on February 25, 2005. Defendant Rose informed Plaintiff that his heart problems were related to his thyroid condition. (Document No. 4-2, pp. 12-13.)

On March 11, 2005, Plaintiff was evaluated by Defendant Rasheed after receiving the radioactive iodine treatment. Defendants Taylor, McLain, and Kirkland met with Plaintiff to discuss his thyroid levels on April 11, 2005. On April 19, 2005, Plaintiff was again examined by Defendant Rasheed. Defendant Taylor examined Plaintiff and prescribed a new medication on April 27, 2005. On April 28, 2005, Defendant McLain informed Plaintiff that his thyroid blood level was too low and prescribed Levothyroxine. (Document No. 4-2, pp. 14-16.)

13

On June 27, 2005, Dr. K Hasan prescribed Haloperidol and Benztropine because Plaintiff was experiencing panic attacks, anxiety, and depression. Plaintiff refused the above medication on March 14, 2006. On April 28, 2006, Plaintiff was prescribed Hadol and Cogentin. On May 17, 2006, Defendant Ellis instructed Plaintiff to continue taking the above medications. (Document No. 4-2, pp. 20-21.) The above medications were subsequently discontinued because Plaintiff "displayed poor compliance in taking this medication consistently." (Document No. 4-14, p. 4.)

In view of the foregoing, the undersigned assumes that Plaintiff's medical conditions are objectively serious. Respecting the second prong of the standard, it is clear that Plaintiff cannot establish that Defendants were deliberately indifferent to Plaintiff's serious medical needs. As indicated above, Plaintiff received timely and proper medical treatment. Plaintiff was evaluated upon arriving at FCI Beckley and was referred to an endocrinologist the following month. The undersigned notes that Defendants examined Plaintiff approximately six times during the one month period between the date of his arrival and the referral. Defendants continued to cautiously monitored Plaintiff following his diagnosis with hyperthyroidism[4] and Graves' disease.[5] The evidence establishes that Defendants routinely referred Plaintiff to an endocrinologist and treated his conditions aggressively

---

[4] Hyperthyroidism (overactive thyroid disease) occurs when the thyroid gland produces too much of the hormone thyroxine. Hyperthyroidism can significantly accelerate the body's metabolism, causing sudden weight loss, a rapid or irregular heartbeat, sweating, and nervousness or irritability. Hyperthyroidism is treated with anti-thyroid medications and radioactive iodine.

[5] Graves' disease is the most common form of hyperthyroidism. It occurs when the immune system mistakenly attacks the thyroid gland and causes it to overproduce the hormone thyroxine. There is no way to stop the immune system from attacking the thyroid gland, but treatments for Graves' disease can ease symptoms and decrease the production of thyroxine. Graves' disease is treated with radioactive iodine treatment. Symptoms of Graves' disease includes the following: Anxiety; Irritability; Difficulty sleeping; Fatigue; A rapid or irregular heartbeat; A fine tremor of your hands or fingers; An increase in perspiration; Sensitivity to heat; Weight loss, despite normal food intake; Brittle hair; Eyeball bulging out past its protective orbit; Enlargement of the thyroid gland; and Frequent bowel movements.

with medications and radioactive iodine treatments. The undersigned therefore finds that Defendants sufficiently followed the treatment plans and recommendations made by specialists. Furthermore, Defendants have conducted numerous examinations, tests, labs, and scans on Plaintiff since his admission into FCI Beckley. Plaintiff complaints that Defendants' failure to timely treat his Graves' disease and hyperthyroidism resulted in him developing a heart condition, which was also improperly treated by Defendants. Plaintiff's medical records, however, establish that Defendants conducted numerous echocardiograms on Plaintiff even though a rapid or irregular heartbeat is a common symptom of Graves' disease and hyperthyroidism. Additionally, Dr. Hasan indicated that Plaintiff's heart function had substantially improved since 2002. (Document No. 4-9, pp. 8-9.) If anything, Plaintiff simply disagrees with the appropriate course of treatment and his prescribed medications. An inmate's disagreement with his medical care or his course of treatment for an objectively serious medical injury generally will not constitute a sufficient basis for a constitutional claim. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Reading Plaintiff's documents liberally as required and considering facts as alleged and which might be implied, the undersigned finds that they cannot be read to allege indifference to his serious medical needs in violation of the Eighth Amendment of the United States Constitution and cognizable under Bivens. Accordingly, it appears beyond doubt that Plaintiff can prove no set of facts in support of the requisite second prong of his Eighth Amendment claim that he has received inadequate medical treatment.

  B. **Plaintiff's Due Process Claim:**

It is clear that interests protected by the Due Process Clause of the Fifth Amendment are not implicated in this case.[6] It is fundamental that procedural due process only arises when an inmate's

---

[6] The Fourteenth Amendment applies when those alleged to have violated the inmate's constitutional rights were acting under color of State law and is therefore inapplicable in this case

liberty or property interest is deprived. Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The Supreme Court held in Sandin that interests protected by the Due Process Clause "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . ., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id., 515 U.S. at 484, 115 S.Ct. at 2300 (Citations omitted) Thus, for example, as the Supreme Court determined in Sandin, 515 U.S. at 486, 115 S.Ct. at 2301, disciplinary segregation does not create an "atypical and significant hardship" triggering due process protections. See also Thomas v. Ramos, 130 F.3d 754, 760-62 (7th Cir. 1997). Clearly, the focus in assessing whether an inmate's claims of due process violations have any merit is upon the nature of the alleged deprivation. Absent allegations indicating that there has been a restraint upon the inmate's freedom which imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," the inmate's claims have no merit. Thus, when a person is in federal custody by virtue of a judgment of conviction, his claims of constitutionally inadequate medical care are evaluated under the Eighth Amendment absent any indication of an unconstitutional deprivation of liberty. When a person is in federal custody as a pretrial detainee on the other hand, his claims are evaluated under the Due Process Clause of the Fifth Amendment. Loe v. Armistead, 582 F.2d 1291, 1293-94 (4th Cir. 1978), cert. denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980). In any event, the standard is the same in evaluating claims of constitutionally inadequate medical care under the Fifth and Eighth Amendments. See Natale v. Camden County Correctional Facility, 318 F.3d 575, 581-82 (3d Cir. 2003). In the present case,

---

because Plaintiff was in federal custody and Defendants were federal employees when the circumstances which form the basis for Plaintiff's claims occurred.

Plaintiff was in federal custody pursuant to a judgment of conviction at the time the alleged deliberate disregard of his serious medical needs occurred, there is no indication of any unconstitutional restraint upon Plaintiff's liberty, and in any event, application of the Eighth Amendment standard yields the conclusion that Plaintiff's claims have no merit. For these reasons, the undersigned finds that Plaintiff's claim that Defendants violated his due process rights is without merit.

### III.     Plaintiff's Motion for Temporary Restraining Order/Preliminary Injunction.

In considering whether to issue an injunction, the District Court must balance the hardships likely to befall the parties if the injunction is, or is not, granted. Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 196 (4th Cir. 1977). Proper balancing of the hardships requires the District Court to weigh the relative importance of four factors:

(1)     the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;

(2)     the likelihood of harm to the defendant if the requested relief is granted;

(3)     the likelihood that the plaintiff will succeed on the merits; and

(4)     the public interest.

Manning v. Hunt, 119 F.3d 254, 263 (4th Cir. 1997) (*quoting* Rum Creek Coal Sales, Inc., v. Caperton, 926 F.2d 353, 359 (4th Cir. 1991)). Consideration of the first two factors is the first step in the analysis. Blackwelder, 550 F.2d at 196. If the District Court concludes that the balance of the potential hardships favors the Plaintiff, then "it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success." Id.

First, the undersigned finds that the District Court simply cannot consider Plaintiff's request that the Court enter an Order directing the Defendants to provide him with examinations by an endocrinologist and cardiologist every 90 or 180 days. To do so would entail consideration of matters

involving medical judgment which are not proper subjects for judicial consideration. Second, the undersigned finds that Plaintiff's request for injunctive relief must fail on substantive grounds. Reading Plaintiff's Motion together with his Complaint and Memorandum of Law, it does not clearly appear that immediate and irreparable injury, loss, or damage will result to Plaintiff if a preliminary injunction is not granted. Proceeding with the first two factors in the <u>Blackwelder</u> analysis, Plaintiff has failed to allege either irreparable harm to himself if the "requested" injunction is denied or a lack of harm to the Defendants if the injunction should issue. In fact, after balancing the first two factors, the Court finds that the harm to the Defendants clearly outweighs the alleged harm to the Plaintiff and would entail the Court to make a judgment which is not a proper matter for judicial consideration. The undersigned finds that neither grave nor serious questions are presented in this matter, and, as discussed above, Plaintiff cannot succeed on the merits. Plaintiff's request for an injunction must be denied.

**PROPOSAL AND RECOMMENDATION**

The undersigned therefore respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **DENY** Plaintiff's Application to Proceed *in Forma Pauperis* (Document No. 1.) and Motion for Temporary Restraining Order and Preliminary Injunction (Document No. 8.), **DISMISS** Plaintiff's Complaint (Document No. 4.) and remove this matter from the Court's docket.

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Thomas E. Johnston. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(e) and 72(b), Federal Rules of Civil Procedure, the Plaintiff shall have thirteen days from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court

specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Johnston and this Magistrate Judge.

The Clerk of this Court is directed to file this "Proposed Findings and Recommendation" and to mail a copy of the same to Plaintiff, who is acting *pro se*.

ENTER: January 22, 2008.

R. Clarke VanDervort
United States Magistrate Judge